IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 5, 2009

**MARQUIS DAY v. STATE OF TENNESSEE**

**Direct Appeal from the Circuit Court for Madison County**
**No. C-04-186     Jerry Scott, Judge**

**No. W2008-01224-CCA-R3-PC  - Filed October 23, 2009**

The petitioner, Marquis Day, appeals from the post-conviction court's denial of post-conviction relief as it relates to the petitioner's convictions of first-degree murder, conspiracy to commit first-degree murder, fabricating evidence, and the unlawful possession of a weapon. On appeal from the judgment of the post-conviction court, the petitioner asserts that he received the ineffective assistance of counsel at trial and on direct appeal. Following our review of the record and the parties' briefs, we affirm the judgment of the post-conviction court denying post-conviction relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which THOMAS T. WOODALL and CAMILLE R. MCMULLEN, JJ., joined.

Robert Brooks, Memphis, Tennessee, for the appellant, Marquis Day.

Robert E. Cooper, Jr., Attorney General and Reporter; Lacy Wilber, Assistant Attorney General; James G. Woodall, District Attorney General; and Alfred Lynn Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Background

Following a jury trial, the petitioner was convicted of first-degree murder, conspiracy to commit first-degree murder, fabricating evidence, and the unlawful possession of a weapon. On direct appeal, this court affirmed the convictions. *See State v. Marquis Day*, No. W2000-01618-CCA-R3-CD, 2001 WL 1426560 (Tenn. Crim. App., at Jackson, Nov. 9, 2001), *perm. app. denied* (Tenn. April 29, 2002). The following is a summary of the facts of the case taken from this court's opinion on direct appeal:

On July 9, 1997, Milton Herron was stabbed and shot to death in the home occupied by Brenda DeBerry and her juvenile son, Montrell. The DeBerrys, [the petitioner]

Marquis Day, then also a juvenile, and a third juvenile, Brian Morrow, were arrested and charged with first degree murder, conspiracy to commit first degree murder, fabrication of evidence, and unlawful possession of a weapon. A juvenile transfer hearing for the [petitioner] was conducted on July 30, 1997. By order dated August 1, 1997, the [petitioner] was transferred to the Circuit Court of Madison County to be tried as an adult. Co-defendant Brian Morrow entered into a plea agreement in juvenile court and agreed to testify against his three co-defendants at trial. [The petitioner's] trial began October 4, 1999.

Brian Morrow FN1 was 16 years old at the time of the shooting in July 1997. He had known [the petitioner] Marquis Day and Montrell DeBerry for several years. Prior to this offense, he had never been in any criminal trouble.

> FN1. The name was spelled "Marrow" and "Morrow" in different parts of the transcript. This court has chosen to use the spelling contained in the indictment.

Morrow testified that on the evening of July 8 and the early morning hours of July 9, 1997, he was at the residence of Brenda and Montrell DeBerry in Jackson, Madison County, Tennessee. The [petitioner] was also present. Morrow arrived around 9:00 p.m., and began watching television with the other three individuals. While there, he listened to a conversation in which the DeBerrys and the [petitioner] discussed their intention to kill Milton Herron. Morrow understood that the plan to kill Herron was related to a dispute over a pistol which they had previously taken from him. Morrow observed two pistols and a .12 gauge sawed-off shotgun in the home. Although Morrow was disconcerted by the conversation, he did not leave, because he believed that the three other individuals would follow him and perhaps harm him if he tried to leave.

While the conversation was being conducted, the telephone rang. Montrell DeBerry answered the phone. Morrow could hear him speaking to someone who apparently advised that he was on his way over to get the gun.

About fifteen minutes later Milton Herron arrived at the DeBerry residence and knocked on the door. Brenda DeBerry answered the door. Her son went to the kitchen. Ms. DeBerry asked Herron to raise his shirt, and then she patted him down, apparently searching for a weapon. Herron entered the living room. According to Morrow, Montrell DeBerry then came into the room carrying a hand pistol, and the [petitioner] came in carrying a knife. The [petitioner] stabbed the victim in the back, and DeBerry shot him in the chest five or six times. Herron spoke, asking why they were taking these actions. He remained standing for a couple of minutes, then began hollering and finally fell down. The [petitioner] then took a sawed-off shotgun and hit the victim in the head several times.

At that point Brian Morrow left the house through the side door. As he stepped outside he heard a shotgun blast. Morrow walked toward the home of Calvin Albea. He encountered Kenneth McCallister, who was walking down the street. McCallister inquired what was happening in the house. Morrow responded that he had not done anything, and then rode off on a bicycle.

Morrow testified that shortly thereafter he observed the [petitioner] and the DeBerrys leave the house. Montrell DeBerry drove off in the blue pickup truck in which Mr. Herron had arrived. The [petitioner] rode in the passenger seat of that vehicle. Brenda DeBerry followed in her own automobile. They disappeared from sight. About ten minutes later Ms. DeBerry returned in her car. Both her son and the [petitioner] were passengers in the car with her. The three individuals instructed Morrow to get into the car with them, and he did. The four individuals drove to Wal-Mart, where they purchased cleaning supplies. They also purchased new curtains. They then went to another store and purchased playing cards and a 12-pack of beer.

The four then returned to the DeBerry home. Morrow sat down in the living room. The other three individuals cleaned and shampooed the carpets and walls. Ms. DeBerry removed blood-stained curtains and replaced them with the new curtains she had bought. Ms. DeBerry then threw the old curtains in a dumpster. After the three completed cleaning the house, they sat down and played cards. The DeBerrys and the [petitioner] began talking about how they had "done away with" Milton Herron. The four individuals played cards until the sun came up. Only the [petitioner] and Montrell DeBerry drank the beer.

Two days later Morrow was arrested and taken to the sheriff's department, where he gave a statement. During the time he was being held in the juvenile detention center he had at least one conversation with the [petitioner]. Morrow testified at trial that the [petitioner] attempted to persuade him not to tell the truth about his involvement in the case. Morrow acknowledged that he eventually reached a plea agreement in the case, and pled guilty only to the offense of being an accessory after the fact of murder.

On cross examination Morrow acknowledged that because of the plea agreement he reached he was treated as a juvenile rather than being transferred to adult court for trial. He received complete probation of the sentence he was given. He also acknowledged that he was aware of previous trouble that existed between Montrell DeBerry and Mr. Herron, the victim, based on DeBerry's theft of ten pounds of marijuana from Herron. DeBerry appeared to be worried that Herron would attempt to harm him because of the theft. Morrow denied that he had assisted in the theft of the marijuana, but admitted he had smoked some of it.

Kenneth McCallister identified himself as a cousin of Brian Morrow. He testified that on the night of July 9, 1997, he was in the DeBerrys' neighborhood when he

-3-

observed Brian Morrow walk from the back side of the DeBerrys' house and onto the driveway. The two spoke. McCallister then heard a gunshot come from inside the DeBerry residence. Morrow went on down the street. McCallister soon observed the [petitioner], Montrell DeBerry, and DeBerry's mother, leave the residence. The two men got into a dark pickup truck and drove away. Ms. DeBerry followed in a gold-colored car. Mr. McCallister did not observe when the individuals returned to the house.

McCallister testified that he was returning from the Sonic when these events occurred. He denied that he had been drinking or taking any drugs that day.

Deputy Donald McIntosh of the Madison County Sheriff's Department, testified that at about 3:39 a.m. on the morning of July 9, 1997, while on patrol, he observed a dark pickup truck on the side of the road. He stopped to investigate, and observed the deceased body of a male, wrapped in a blue quilt, in the bed of the pickup truck. McIntosh immediately called for an ambulance and crime scene investigators. He took some photographs, and later assisted Sergeant Jeff Fitzgerald and Deputy Owen in taking other photographs. The deceased individual was identified as the victim, Milton Herron. Deputy McIntosh stayed until the criminal investigators had completed their tasks and the victim was removed. He then left the scene.

Deputy McIntosh testified that he did not recall whether the truck was dusted for fingerprints. He also did not personally engage in a search for footprints. He was not certain whether other investigators conducted such a search.

During Deputy McIntosh's testimony, the state offered into evidence a number of photographs. The defense objected to the admission of the pictures. The court sustained the objection as to several photographs, but allowed several others to be introduced into evidence.

Madison County Sheriff's Department Sergeant Jeff Fitzgerald testified that in the early morning hours of July 9, 1997, he received a request from Lieutenant McIntosh to come to Christmasville Road, where a dead man had been discovered in the bed of a pickup truck. A pocket knife was found on the person of the victim. Sergeant Fitzgerald confirmed that no attempt was made to take fingerprint imprints from the truck, because it had been raining that night.

Sergeant Fitzgerald identified a bullet that was recovered by Dr. Tony Emison from the body of the victim.

In the course of his investigation Sergeant Fitzgerald determined that the homicide had occurred at 203 Hickory Hills. He went to that scene to continue the investigation. Among the items of evidence he recovered at the scene were curtains, bone fragments found on the driveway, and blood observed in the same general location as the bone fragments. Sergeant Fitzgerald also identified photographs of

-4-

mini-blinds, a window sill, wall and baseboard inside the residence, all containing blood. Sergeant Fitzgerald also observed a shampooing machine, which contained a liquid with a reddish tint. He noticed that the living room carpet appeared to be extremely wet.

Sergeant Fitzgerald testified that a butcher knife, a kitchen knife, and a revolver were all found at the Hickory Hills home. The revolver was a silver Johnson .22 caliber revolver. It was ultimately identified as having nothing to do with the case.

On cross examination Sergeant Fitzgerald confirmed that his department had not made any attempt to lift fingerprints from the pickup truck. That task was usually assigned to Investigator Mike Turner of the Jackson Police Department, who was better equipped to perform it. Officer Turner lifted partial fingerprints, but none were sufficient to send for testing. No request was made to check for fingerprints inside the house. Sergeant Fitzgerald also acknowledged that none of the shirts taken from the appellant tested positive for the presence of blood.

Greg Kesterson testified that in the early morning hours of July 9, 1997, he was returning home from vacation. While driving down Christmasville Road he observed a pickup truck on the road shoulder. Just before observing the truck he observed a beige-colored car traveling rapidly toward town. He observed the truck parked in a peculiar position, partially extended into the open road, and still running. At that time he was unable to determine how many persons were in either the car or the truck.

Dalvin Albea testified that, on a day he believed was just after the murder, he engaged in a conversation with the appellant about a sawed-off shotgun the appellant had in his possession. The appellant asked Albea to take the gun to Montrell DeBerry's house. Albea complied and delivered the gun to the DeBerry house. He was not certain whether this activity occurred before or after Herron's murder. When Albea arrived at the DeBerry house no one was home, so he left the gun under the carport.

Samera Zavaro is the Memphis Crime Laboratory Supervisor of the Tennessee Bureau of Investigation. She is an expert in serology. Zavaro testified about the results of tests performed on a number of items submitted to the crime laboratory in this case. She identified positive results for blood in the steam vacuum wheels, an air vent, and curtain pieces. Other items submitted did not test positive for the presence of blood.

Dr. O.C. Smith is an expert in forensic pathology. He performed an autopsy on the remains of the victim, Milton Herron. Dr. Smith testified that Mr. Herron died from multiple injuries, including five gunshot wounds, three in the back of the left shoulder, one in the middle of the back, and one to the right side of the head. There was also a shotgun wound on the left side of the victim's abdomen. There were

multiple small stab wounds to the right side of his face and neck. Dr. Smith also observed a minimum of seven blows to the right side of the victim's head, which were of sufficient force to tear the scalp, crush the skull, and expel the brain. Dr. Smith testified that the victim was alive at the time each gunshot wound, blunt trauma blow, and shotgun blast was inflicted upon his person. Bone fragments were missing from the victim's head. Dr. Smith identified two bone fragments recovered from the scene as being derived from an African-American. He testified that the victim did not sustain any defensive wounds. Dr. Smith was unable to determine exactly how many different people were involved in the infliction of the injuries to the victim. Dr. Smith acknowledged that he found a low blood alcohol content and remnants of marijuana in the victim's body.

Calvin Albea testified for the defense. He acknowledged that he was the brother of Dalvin Albea who had testified earlier. At about 10:00 p.m. on the night of July 8, 1997, he had just finished work and dropped in at the home of Teresa Grimes. He was standing outside the house talking to Ms. Grimes. He noticed a black Nissan belonging to Montrell DeBerry's father travel up and down the roadway several times. Later he saw a dark truck and Montrell DeBerry's mother's car travel down the road. He could not tell who was inside the truck, but saw only one head. Albea denied seeing Mr. Morrow or the [petitioner] that evening.

*Marquis Day*, 2001 WL 1426560, at *1-4. On January 27, 2003, the petitioner filed a *pro se* petition for post-conviction relief. By an order of the post-conviction court, the petition was dismissed without prejudice, the petitioner was allowed ninety days to file another petition, and counsel was appointed. On May 7, 2004, a second *pro se* petition was filed within the ninety days allowed. Pursuant to an order entered March 18, 2005, the petitioner's court appointed counsel was allowed to withdraw and new counsel was appointed. On June 27, 2005, the post-conviction court held a hearing on the petitioner's claim of the ineffective assistance of counsel. Prior to ruling on the merits of the petitioner's claim, the post-conviction court entered an order finding that court appointed counsel for the petitioner "once represented the Petitioner's co-defendant." The court appointed new counsel for the petitioner. A subsequent consent order was entered allowing the substitution of court appointed counsel with retained counsel and an amended petition was filed.

The post-conviction court conducted another hearing on February 15, 2007. A copy of the hearing transcript was made a part of the record and reflects that upon the unopposed motion of the petitioner's post-conviction counsel, the post-conviction court made "a copy of the entire appellate record from the first trial" an exhibit to the hearing. However, neither the exhibit nor any part of the transcript of the pre-trial proceedings at issue in this appeal are included in the record before us.

At the second post-conviction hearing, the following pertinent testimony was presented. The petitioner testified that he retained trial counsel to represent him on charges for which he was convicted and received a life sentence. He claimed that months before his trial on the charges, he wanted to hire new counsel. The petitioner stated that after he filed a petition with the Board of Professional Responsibility against trial counsel, trial counsel visited the petitioner in prison. The petitioner agreed to allow trial counsel to remain on the case and counsel agreed to properly

investigate his case. However, about two months before the trial, the petitioner discovered that trial counsel had not properly prepared for the trial. The petitioner stated that trial counsel did not investigate the case and "never talked to the witnesses." Prior to the trial, he told trial counsel "three or four times [the petitioner] wanted another attorney." According to the petitioner, he first told trial counsel he wanted another attorney "[p]robably about two months" before trial.

The petitioner testified that he planned to hire other counsel and that he had a particular attorney in mind. He said that Josephine Davis, his grandmother, was going to pay the fee for new trial counsel. Ms. Davis had retained trial counsel and subsequently retained the petitioner's appellate and post-conviction counsel. The petitioner stated that on the day of trial, he "didn't actually hear [trial counsel] address the Court" regarding his desire to hire new counsel. He said that trial counsel told him "it was flat out denied." The petitioner said that he was not in the courtroom when the trial court ruled. He said that when he entered the courtroom, the trial judge did not ask him anything regarding his desire to have new representation. The petitioner stated that he would have liked the opportunity to talk to the judge. He said that he thought that the attorney that he planned to hire was better than trial counsel. According to the petitioner, "[a]ll [he] had to do was make a phone call and [his] grandmother would have taken care of that . . . just give her a name and she would have called and handled it for [him]." On cross-examination, the petitioner explained that he did not fire trial counsel and hire another attorney because trial counsel told him "that [he had] to talk to the judge and see what the judge thinks about it." He explained that he did not go ahead and hire new trial counsel because he "was young . . . [and] thought [he] had to have the Court's consent to fire a lawyer and hire another lawyer." The petitioner admitted, "Had I known what I know now, . . . I would have [done] that." On redirect examination, the petitioner stated that he thought he had to have the court's permission to substitute counsel, because trial counsel "said to let him get with the judge and see what the judge thinks about it."

Ms. Davis testified that she hired trial counsel to represent the petitioner at trial and on appeal. She stated that she did not hire counsel to represent the petitioner in his post-conviction proceedings and stated that his mother hired post-conviction counsel. She agreed that it was her understanding that at the time of trial, the petitioner wanted another lawyer to represent him. Ms. Davis agreed that she was prepared to hire another lawyer to represent the petitioner and had the funds to do so as she "was working at that time."

Trial counsel testified that in 1997, he was called upon by juvenile court to represent the petitioner. The matter was transferred to circuit court and in October of 1999, a trial was held on charges of first degree murder and conspiracy. Trial counsel recalled that on the day of trial, he approached the court about a continuance. The petitioner and trial counsel "had been meeting prior to the trial and . . . [on] the night before, [the petitioner] wanted a continuance and wanted to let [trial counsel] go." Trial counsel stated his response to the petitioner's request was that he "brought the issue up to [the trial judge] immediately that morning and [the trial judge] told [him] it was too late to raise it and we were going to trial. Trial counsel said that the motion was made before jury selection, but was not put in writing because, "we met late into the evening the night before in preparation for trial." Trial counsel stated that the petitioner had previously expressed dissatisfaction with counsel over plea negotiations and for failing to file a motion to suppress his statement. With regard to the petitioner's dissatisfaction with plea negotiations, trial counsel stated that the petitioner

was not satisfied with the state's response to his counter offer. The petitioner questioned trial counsel about the negotiations because he did not understand that the state's offer could go up closer to trial. Trial counsel stated the petitioner did not ask him to withdraw as a result of the plea negotiations. He said he and the petitioner resolved their differences and he did not "recall having any requests to be let go previous [to trial] that [were] not resolved." However, on the night before the trial, the petitioner "was insistent."

Trial counsel said that the court reporter and the prosecutor were present when he "explained to the Judge the basis for the motion and it was denied." According to trial counsel, "[t]he case had been continued . . . a couple of times before and [the trial judge] remarked that it was too late." Trial counsel thought that the trial judge "said something else, but [he could not] recall what it was." On cross-examination, trial counsel stated he and the petitioner "had a problem at a certain point previous to the trial and previous to the motion the morning of trial, but that [they] had resolved it and decided to go forward." He stated, "when the case was concluded, [he] thought [he] had won the case." According to trial counsel, the petitioner's "grandmother spoke with [him] after the trial and was very satisfied with [his] representation and met with [him] about retaining [trial counsel] for the appeal." Regarding their previous difference of opinion, trial counsel stated he could not "specifically say" whether the petitioner had previously asked him to withdraw, "[b]ut . . . in his mind . . . the differences were resolved." Trial counsel stated that prior to trial, "had the differences not been resolved [he] would have made the motion." According to counsel "this being a first degree murder case and the issue being counsel of his choosing, [he] definitely would have" pursued a motion to substitute counsel, had their differences not been resolved. Trial counsel stated he had been in a motorcycle accident in 1997, but he denied that he was addicted to pain killers at the time of the trial. He further stated that he did not take any pain killers or consume any alcohol during the petitioner's trial. Trial counsel stated that he did not believe that the petitioner was in the courtroom when he addressed the court on the petitioner's dissatisfaction with trial counsel.

The post-conviction court addressed trial counsel as follows:

I think the record shows, . . . that he was not present. I believe you brought that to the Court's attention. The judge talked about the fact that he was not there. You had said he was downstairs putting his clothes on and I think the Court asked you how long will that take and you said, "Hopefully no more than what he told me, five minutes. Also he is trying to get a razor." The judge wanted to know why they couldn't get a [ten] cent razor to him quicker than that, so he was not there according to the record. So you recall the record is correct about that?

Trial counsel confirmed the post-conviction court's statements, replying, "That would be correct." After taking the matter under advisement, the post-conviction court entered an order denying the petition for post-conviction relief. The petitioner has appealed.

Analysis

-8-

To succeed on a post-conviction claim, the petitioner must prove the allegations of fact set forth in his petition by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f) (2006). On appeal, this court is required to affirm the post-conviction court's findings unless the petitioner proves that the evidence preponderates against those findings. *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999). Our review of the post-conviction court's factual findings, such as findings concerning the credibility of witnesses and the weight and value given their testimony, is *de novo* with a presumption that the findings are correct. *See id.* Our review of the post-conviction court's legal conclusions and application of law to facts is *de novo* without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 457-58 (Tenn. 2001).

At the outset, we address the petitioner's argument that the trial court erred in ruling on his motion for a continuance; and his related assertion that the issue was not waived due to the ineffective assistance of counsel in failing to raise it on direct appeal. The petitioner asserts that the post-conviction court erred in determining that the issue had been waived. Our review of the issue as presented in this appeal is hampered due to the petitioner's failure to include in the record a transcript of the pre-trial motion for a continuance by trial counsel. "It is the duty of the appellant to prepare a record that conveys a fair, accurate, and complete account of what transpired in the trial court with respect to the issues that form the basis of the appeal." *State v. Robinson*, 73 S.W.3d 136, 154 (Tenn. Crim. App. 2001) (citations omitted); *see also* Tenn. R. App. P. 24(b). However, even without a transcript of the proceedings, we glean from the record before us that there is no doubt of the petitioner's absence from the courtroom when trial counsel moved for a continuance to allow the substitution of counsel and when the trial court denied the motion. In *State v. Gilmore*, 823 S.W.2d 566 (Tenn. Crim. App. 1991), the court discussed the circumstances in which a defendant is entitled to substitution of counsel stating:

> When an accused seeks to substitute counsel, the accused has the burden of establishing to the satisfaction of the trial judge that (a) the representation being furnished by counsel is ineffective, inadequate, and falls below the range of competency expected of defense counsel in criminal prosecutions, (b) the accused and appointed counsel have become embroiled in an irreconcilable conflict, or (c) there has been a complete breakdown in communications between them.

*Id.* at 568-69. The court in *State v. Ray*, 880 S.W.2d 700 (Tenn. Crim. App. 1993), applied the standards set out by the *Gilmore* court stating:

> A trial court must "take particular pains in discharging its responsibility to conduct these inquiries concerning substitution of counsel and waiver of counsel. Perfunctory questioning is not sufficient. This is true even when the trial judge strongly suspects that the defendant's requests are disingenuous[.]" In the present case, the trial court refused to hear appellant as to the specifics of his dissatisfaction with counsel. In doing so, the court made it difficult to determine whether good cause existed for substitution of counsel.

The appointment and relief of counsel rests within the sound discretion of the trial court. We respectfully submit that the trial court erred in prohibiting appellant from putting on proof concerning his motion to appoint new counsel.

*Id*. at 703-04. Based on the limited record before us, it does not appear that the trial court made the necessary inquiries. While the record does not support that the trial court refused to allow the petitioner to put on evidence, neither does it support that the trial court took "particular pains in discharging its responsibility to conduct these inquiries concerning substitution of counsel." *Ray*, 880 S.W.2d at 703(referring to the inquires set fourth in *Gilmore*, 823 S.W.2d at 568-69). Accordingly, we conclude that the trial court erred in failing to made sufficient inquiry on the petitioner's motion for a continuance.

On appeal, the petitioner asserts that the trial court committed a structural constitutional error and therefore his convictions must be reversed. In conducting harmless error analysis, our supreme court has identified three categories of errors: (1) structural constitutional error; (2) non-structural constitutional error, and (3) non-constitutional error. *State v. Rodriguez*, 254 S.W.3d 361, 371 (Tenn. 2008); *State v. Powers*, 101 S.W.3d 383, 397 (Tenn. 2003); *State v. Garrison*, 40 S.W.3d 426, 433-34 (Tenn. 2000); *State v. Harris*, 989 S.W.2d 307, 314-15 (Tenn. 1999). Structural constitutional errors involve "defects in the trial mechanism" that "compromise the integrity of the judicial process itself." *Rodriguez*, 254 S.W.3d at 371. Structural constitutional errors "have an impact upon '[t]he entire conduct of trial from beginning to end'" and require automatic reversal. *Momon v. State*, 18 S.W.3d 152, 165 (Tenn. 1999) (quoting *Arizona v. Fulminante*, 499 U.S. 279, 311(1991)). The complete denial of the right to counsel, denial of the right to self-representation at trial, denial of the right to a jury trial, and racial discrimination in grand jury selection are examples of structural constitutional errors. *Rodriguez*, 254 S.W.3d at 361; *Momon*, 18 S.W.3d at 165-66. In the instant case, we do not consider the trial court's failure to make a sufficient inquiry on the petitioner's motion for a continuance to be a defect in the structure of the trial mechanism that would "necessarily render a criminal trial fundamentally unfair or an unreliable vehicle for determining guilt or innocence." *See State v. Garrison* 40 S.W.3d 426, 435 (Tenn. 2000) (quoting *Neder v. United States,* 527 U.S. 1, 8-9 (1999)). Therefore, we proceed to a harmless error analysis. *See id.*

"When necessary to do substantial justice," this court may address an "error that has affected the substantial rights of a party at any time." Tenn. R. App. P. 36(b). For an issue to be considered plain error, each of the following five factors must be met:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is "necessary to do substantial justice."

*State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994); *see also State v. Smith*, 24 S.W.3d 274, 283 (Tenn. 2000) (adopting the *Adkisson* test for determining plain error). Furthermore, the " 'plain error' must be of such a great magnitude that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir.

1988)).  In finding the trial court's denial of a motion to appoint new counsel without allowing the defendant to present proof to be harmless error, the court in *Ray* stated:

> We do not find, however, that appellant was prejudiced by the denial of the motion. A review of the record indicates that appellant received effective representation from the Public Defender's Office.  Furthermore, there is no indication, other than the alleged letter, that counsel was racially biased against appellant.

880 S.W.2d at 704.  Likewise, in the instant case, the petitioner has failed to show that he was prejudiced by his absence in the courtroom or by the denial of the motion.  And as more fully addressed herein, a review of the record indicates that the petitioner received effective representation from counsel at trial and on appeal.  Furthermore, other than the unsupported testimony of the petitioner at the post-conviction hearing, there is no indication that meritorious grounds for the motion for a continuance existed at the time of trial.  Accordingly, we conclude that the error by the trial court with regard to denial of the petitioner's motion for a continuance was harmless.  The post-conviction court did not err in holding the issue had been waived.

The Ineffective Assistance of Counsel

On appeal, the petitioner asserts that trial counsel was ineffective.[1]  Specifically, he states, "[t]he petitioner's claim, . . . is strictly one of ineffective assistance of both trial and appellate counsel with respect to the handling of the court's action denying the motion to substitute counsel in the petitioner's absence."  The state asserts that the petitioner has not shown that trial counsel's performance was deficient or that he was prejudiced.  The state argues that the petitioner has failed to show he received the ineffective assistance of counsel.

In order to establish the ineffective assistance of counsel, the petitioner bears the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense rendering the outcome unreliable or fundamentally unfair. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also Arnold v. State*, 143 S.W.3d 784, 787 (Tenn. 2004).  Deficient performance is shown if counsel's conduct fell below an objective standard of reasonableness under prevailing professional standards.  *Strickland*, 466 U.S. at 688; *see also Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975) (establishing that representation should be within the range of competence demanded of attorneys in criminal cases).  A fair assessment of counsel's performance, "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002).  Deference is made to trial strategy or tactical choices if they are informed ones based upon adequate preparation. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).  The fact that a particular strategy or tactical decision failed does not by itself establish ineffective assistance of counsel.  *Goad v. State*, 938 S.W.2d 363,

---

[1] In his petition and in subsequent filings, the petitioner argued that his claim of ineffective assistance of counsel was supported by grounds that he has abandoned on appeal.  Since our review generally does not extend to issues not presented for review, we decline to address arguments in support of the petitioner's claim of ineffective assistance of counsel pursued below but not presented to this court for review. *See* Tenn. R. App. P. 13(b).

-11-

369 (Tenn. 1996). Once the petitioner proves that counsel's representation fell below a reasonable standard, the petitioner must also prove prejudice. Prejudice is shown if, but for counsel's unprofessional errors, there is a reasonable probability that the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694. Both deficient performance and prejudice must be established to prove ineffective assistance of counsel. *Id.* at 697. If either element of ineffective assistance of counsel has not been established, a court need not address the other element. *Id.*

### A. Trial Counsel's Failure to Ensure the Petitioner's Presence

The petitioner asserts that trial counsel fell below a reasonable standard because he failed to ensure that the petitioner was present at the time that trial counsel addressed the court on his dissatisfaction with counsel and his motion for a continuance. The record reflects that trial counsel addressed the court on the motion for a continuance to obtain new representation prior to the selection of the jury. The record also indicates that trial counsel made the court aware that the petitioner was not in the courtroom and that he was expected within minutes. Trial counsel testified that he told the court the reasons for the continuance. We glean from the parties' briefs and the record that the trial court indicated its understanding that the petitioner was dissatisfied with trial counsel and wanted to hire a new attorney. In our view, the record does not support that trial counsel failed to protect the petitioner's constitutional right to be present at trial. Further, we do not view any failure on the part of the trial court in ruling on the motion without directly questioning the petitioner to be indicative of any failure by trial counsel to protect the petitioner's constitutional rights. A defendant has both a constitutional and a statutory right to be present during his or her trial. *See State v. Muse* 967 S.W.2d 764, 766-67 (Tenn. 1998) (citing U.S. Const. amends. V, VI, XIV; Tenn. Const. art. I, § 9; Tenn. R. Crim. P. 43(a)). "Presence at 'trial' means that the defendant must be present in court from the beginning of the impaneling of the jury until the reception of the verdict and the discharge of the jury." *Id*. at 766 (*citing Logan v. State*, 131 Tenn. 75, 173 S. W. 443, 444 (1915)). At the post-conviction hearing, trial counsel testified that he made his motion for a continuance prior to the selection of the jury. The petitioner has failed to show either the violation of his right to be present at trial, or any deficiency by trial counsel in protection of that right. Finally, the petitioner has also failed to show that he was prejudiced.

### B. The Petitioner's Right to the Effective Assistance of Counsel

Regarding the petitioner's right to the effective assistance of counsel, we agree with the post-conviction court's finding that the petitioner's right to counsel had been protected. Our review of the record reveals that the post-conviction court credited the testimony of trial counsel that previous differences between the petitioner and trial counsel had been resolved. Until the night before the trial, the petitioner had not indicated that he wanted to hire new counsel. Trial counsel further testified that the petitioner's grandmother told him that she was pleased with his representation of the petitioner and that she retained him to represent the petitioner on appeal. The petitioner complained that trial counsel failed to investigate or talk to witnesses, however, he failed to produce a single witness at the post-conviction hearing to support that he was prejudiced. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (concluding that generally, the presentation of witnesses at the post-conviction hearing is necessary to prove that counsel's failure to utilize these witnesses resulted in prejudice to the petitioner). Moreover, the remaining facts including that the motion was made on

the day of trial, that the petitioner had retained trial counsel well before the trial, and that the petitioner failed to have new counsel present in court on the day of trial support the post-conviction court's finding that the petitioner received the effective assistance of counsel. *See State v. Zyla*, 628 S.W.2d 39, 41-42 (Tenn. Crim. App. 1981) (recognizing the right to choice of counsel is not absolute). The petitioner has not only failed to show that any conduct of trial counsel fell below a reasonable standard, but has also failed to demonstrate prejudice. We conclude that the record does not preponderate against the post-conviction court's findings that the petitioner's right to the effective assistance of counsel was protected and that trial counsel "gave advice and rendered services well within the range of competence demanded of attorneys in criminal cases."

Likewise, the petitioner has not shown that counsel was ineffective in failing to raise the issue on appeal. Counsel is not constitutionally required to raise every conceivable issue on appeal, and the determination of which issues to raise is generally within counsel's sound discretion. *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004). If an issue has no merit or is weak, counsel's performance will not be deficient for failure to raise it, and the petitioner will have suffered no prejudice. *Id.* We have concluded that any error by the trial court with regard to a denial of the motion for a continuance was harmless error. We have also concluded that the petitioner failed to show that trial counsel's representation was deficient or that he was prejudiced. *See Strickland,* 466 U.S. at 697. Accordingly, we conclude that the petitioner has failed to show that counsel was deficient in failing to bring the issue on appeal. Also, the petitioner has not shown that he was prejudiced by counsel's representation on appeal. Therefore, having failed to meet his burden of proof to establish the ineffective assistance of counsel at trial or on appeal, the defendant is without relief on this issue.

## Conclusion

Based on the foregoing, we affirm the judgment of the post-conviction court dismissing the petition for post-conviction relief.

_____
J.C. McLIN, JUDGE

-13-